UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ALLEN STEVEN CLARK,

                     Plaintiff,

          v.

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL SECURITY,

                  Defendant.

_____

          <u>DECISION & ORDER</u>

          13-CV-6628P

## <u>PRELIMINARY STATEMENT</u>

Plaintiff Allen Steven Clark ("Clark") brings this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his applications for Supplemental Security Income Benefits and Disability Insurance Benefits ("SSI/DIB"). Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge. (Docket # 13).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Docket ## 10, 11). For the reasons set forth below, this Court finds that the decision of the Commissioner is supported by substantial evidence in the record and is in accordance with applicable legal standards. Accordingly, the Commissioner's motion for judgment on the pleadings is granted, and Clark's motion for judgment on the pleadings is denied.

## BACKGROUND

### I.      Procedural Background

Clark applied for SSI and DIB on April 15, 2011, alleging disability beginning on January 17, 2009, due to asthma and chronic obstructive pulmonary disease ("COPD"). (Tr. 170, 174).[1]  On June 15, 2011, the Social Security Administration denied Clark's claim for benefits, finding that he was not disabled.  (Tr. 90-91).  Clark requested and was granted a hearing before Administrative Law Lawrence Levey (the "ALJ").  (Tr. 40, 100-01, 107-13).  The ALJ conducted a hearing on July 19, 2012.  (Tr. 40-83).  In a decision dated August 24, 2012, the ALJ found that Clark was not disabled and was not entitled to benefits.  (Tr. 11-19).

On October 15, 2013, the Appeals Council denied Clark's request for review of the ALJ's decision.  (Tr. 1-7).  In the denial, the Appeals Council declined to consider an employability assessment from Jose R. Canario ("Canario"), MD, that postdates the ALJ's determination.  (Tr. 2).  Clark commenced this action on November 25, 2013 seeking review of the Commissioner's decision.  (Docket # 1).

### II.      Relevant Medical Evidence[2]

#### A.      Treatment Records

##### 1.      Mercy Medical Center

Treatment notes indicate that Clark was admitted to Mercy Medical Center on August 11, 2003 through the Emergency Department.  (Tr. 250-65).  According to the notes, Clark arrived at the Emergency Department complaining of shortness of breath.  (*Id.*).  He reported that he had a history of asthma, did not regularly see a physician, smoked approximately

---

[1]  The administrative transcript shall be referred to as "Tr. __."

[2]  Those portions of the treatment records that are relevant to this decision are recounted herein.

a pack of cigarettes a day, and used an Albuterol inhaler, but had recently run out.  (*Id.*).  Clark

reported that he worked as a garage door installer and denied environmental exposure to fumes

or dust.  (*Id.*).  According to Clark, he had begun experiencing shortness of breath three days

earlier.  (*Id.*).  He was assessed with asthma exacerbation and was administered breathing

treatments and intravenous steroids without improvement.  (*Id.*).  An examination of his lungs

revealed some scattered rhonchi and wheezing.  (*Id.*).  A chest x-ray revealed no infiltrate or

acute cardiopulmonary process.  (*Id.*).  Clark was admitted and given intravenous steroids and

nebulizer treatments.  (*Id.*).  He was provided a regimen of tapering oral steroids and inhaled

bronchodilators and was encouraged to stop smoking and to establish primary care.  (*Id.*).  He

was discharged the following day.  (*Id.*).

### 2.  Moses Taylor Hospital

Treatment records indicate that Clark went to the Emergency Department at

Moses Taylor Hospital on October 17, 2006 complaining of decreased sleep and appetite.

(Tr. 266-78).  According to Clark, he had not slept more than four or five hours a night for the

previous few days.  (*Id.*).  A physical examination was unremarkable, and the evaluator opined

that Clark appeared to be primarily concerned with being able to smoke and obtaining a note for

work.  (*Id.*).

A spirometry test was performed to assess Clark's pulmonary function.  (*Id.*).

The spirometry revealed a pattern of moderate air flow obstruction.  (*Id.*).  Clark was

administered a bronchodilator, which resulted in significant improvement, although there was

incomplete improvement in the FEV1.  (*Id.*).  The treatment notes indicate that Clark was a

heavy smoker and might be developing emphysema.  (*Id.*).

### 3.    Ajay Shetty, MD

On September 9, 2008, Clark attended an appointment with Ajay Shetty ("Shetty"), MD, for a pulmonary consultation.  (Tr. 279-86).  The treatment notes indicate that Clark had been diagnosed with bronchial asthma as a child.  (*Id.*).  According to Shetty, Clark's asthma appeared to have worsened during the previous three years.  (*Id.*).  Clark reported that his worsening symptoms might have been due to his occupational exposure to zinc dust.  (*Id.*).  He reported that he had been to the emergency room twice during 2007 and suffered from shortness of breath, cough with mucoid sputum and wheezing.  (*Id.*).  According to Clark, his symptoms were worse at night and triggered by perfumes, aerosols and steam.  (*Id.*).  He reported that he treated his symptoms with a nebulizer and an Albuterol inhaler that he used approximately fifteen times a day.  (*Id.*).  Clark reported that he had also been prescribed Advair, but indicated that it did not alleviate his symptoms and was too expensive.  (*Id.*).  According to Clark, he had been smoking approximately one and one-half packs of cigarettes a day for the previous seventeen years.  (*Id.*).

Upon examination, a HEENT exam showed erythema of the posterior pharynx and nasal mucosa.  (*Id.*).  Clark had no cervical lymphadenopathy, his lungs were clear, and his heart sounds were regular.  (*Id.*).  A chest x-ray demonstrated "hyperaeration" suggestive of bronchial asthma, but no evidence of acute pulmonary disease.  (*Id.*).  His lungs, heart, trachea, mediastinum, hila and apices were normal, but there was a posterior blunting of the left costophrenic angle of unknown significance.  (*Id.*).

Pulmonary Functioning Tests demonstrated a significant reduction in the FEV1 (to 58% of predicted) and a reduced FEV1/FVC ratio of 57%.  (*Id.*).  According to Shetty, there was significant improvement in FEV1 with a bronchodilator.  (*Id.*).  Clark's lung capacity and

diffusion capacity were both normal.  (*Id.*).  Shetty assessed that Clark suffered from bronchial

asthma and probable occupational exposure.  (*Id.*).  According to Shetty, Clark appeared to be

developing COPD due to his cigarette smoking.  (*Id.*).  Shetty prescribed an inhaled steroid and

asked him to follow-up in three months.

### 4.    FLH Medical, PC

Treatment notes indicate that Clark began receiving treatment from Jose R.

Canario ("Canario"), MD, at FLH Medical, PC, on March 9, 2011.  (Tr. 298-302).  During the

appointment, Clark reported that he had not seen a doctor since 2008.  (*Id.*).  Clark reported a

history of asthma and a previous COPD diagnosis.  (*Id.*).  According to Clark, he experienced

shortness of breath during short walks, but was able to ascend a flight of stairs without becoming

dyspneic.  (*Id.*).  Clark reported that he had previously been hospitalized twice for asthma

exacerbation, but had not been intubated or admitted to the ICU.  (*Id.*).  According to Clark, he

used an Albuterol inhaler approximately three times a day, drank approximately six beers a day,

and smoked approximately one pack of cigarettes a day, which he had been doing since he was

fifteen years old.  (*Id.*).  Clark denied decreased energy, fever, sleep disorder, night sweats,

cough, sleep apnea, wheezing or weight change.  (*Id.*).  Clark lived with his mother and was

unemployed.  (*Id.*).

Upon examination, Canario noted normal respiration rate, markedly decreased

airflow and expiratory wheezes over the lungs bilaterally.  (*Id.*).  Canario conducted a spirometry

test, which demonstrated a moderate obstructive process.  (*Id.*).  The results demonstrated

reduced FEV1 (to 77% of predicted) and a reduced FEV1/FVC ratio of 65%.  (*Id.*).  Canario

assessed COPD and prescribed Advair, Prednisone, Tessalon and Wellbutrin.  (*Id.*).  Canario

advised Clark to stop smoking and to return in one month.  (*Id.*).

Clark returned for an appointment with Canario on May 9, 2011.  (Tr. 303-04).

He reported that he continued to smoke, but had decreased his consumption to less than a pack a

day.  (*Id.*).  Clark continued to use Advair Diskus, Proventil and Wellbutrin.  (*Id.*).  Canario

advised Clark to continue to take Wellbutrin, which Canario credited for Clark's decreased

desire for cigarettes.  (*Id.*).  Clark continued to complain of COPD symptoms, including cough

and shortness of breath with moderate activity.  (*Id.*).  Upon examination, Canario noted mildly

decreased airflow.  (*Id.*).  According to Canario, Clark continued to suffer from a cough and

occasional shortness of breath, but was much better since he had begun taking Advair and

Proventil.  (*Id.*).  Lab work demonstrated that his lipid panel was slightly elevated, and Canario

prescribed Crestor.  (*Id.*).  Canario advised Clark to diet and exercise.  (*Id.*).

On July 28, 2011, Clark returned for another appointment with Canario.

(Tr. 305-06).  During the appointment, Clark presented with a persistent cough and reported

difficulty breathing that did not always resolve despite the use of his inhaler.  (*Id.*).  He also

reported "rattly" breathing.  (*Id.*).  In addition, he reported shortness of breath with minimal

activity and continued smoking, although at a level of less than a pack a day.  (*Id.*).  According to

Clark, he had not been sleeping well due to his decreased ability to breathe.  (*Id.*).  Upon

examination, Canario noted normal respiration rate, an oxygen saturation of 96%, mildly

decreased airflow, moderate expiratory rhonchi and mild expiratory wheezes over both lungs.

(*Id.*).  Canario noted that Clark had significantly improved after a Duoneb treatment.  (*Id.*).

Clark informed Canario that he was attempting to apply for disability due to his respiratory

issues.  (*Id.*).  Canario referred Clark to a pulmonologist for further evaluation and treatment.

(*Id.*).  Canario also recommended a sleep test to determine whether oxygen at night might

improve his sleep.  (*Id.*).  Canario provided a nebulizer and a prescription for Duoneb to be used

as needed for shortness of breath.  (*Id.*).  Canario again counseled Clark on smoking cessation. (*Id.*).

Clark returned for a follow-up appointment with Canario on August 29, 2011. (Tr. 307-08).  Clark reported that he had stopped taking Crestor after seeing a television commercial that concerned him.  (*Id.*).  Additionally, he had run out of his prescription for Bupropion (Wellbutrin) and had decreased his smoking to less than half a pack a day.  (*Id.*). Clark had failed to obtain lab work as previously directed.  (*Id.*).  Clark denied decreased energy, fever, sleep disorder, night sweats or weight change and described his health as generally good. (*Id.*).  He reported continued cough and shortness of breath with moderate activity.  (*Id.*).  Upon examination, Canario noted normal respiration rate and mildly decreased airflow.  (*Id.*).  Clark's lungs were clear anteriorly, posteriorly and laterally.  (*Id.*).  Canario encouraged Clark to continue to see his pulmonologist, to take the Crestor as prescribed, to continue taking Wellbutrin and to diet.  (*Id.*).

Clark returned for a follow-up appointment with Canario on September 1, 2011. (Tr. 309-10).  During the appointment, he continued to complain of shortness of breath, cough, dyspnea and wheezing.  (*Id.*).  Clark reported that he was currently applying for disability and had undergone an overnight oximetry, although it had malfunctioned.  (*Id.*).  On examination, Clark's respiration was normal, he had moderately decreased airflow and mild expiratory and inspiratory wheezes over his lungs bilaterally.  (*Id.*).  Canario encouraged Clark to continue to take his medications and to continue his treatment with his pulmonologist.  (*Id.*).

On February 2, 2012, Clark attended an appointment with Canario and indicated that he was feeling mildly worse than his previous appointment.  (Tr. 325-27).  Clark reported that his symptoms had worsened since his last visit, he had recently been exposed to illness, and

he did not have any sleep disturbance. (*Id.*). He reported that his symptoms were aggravated by exposure to cigarette smoke and cold temperatures, anxiety, climbing stairs and walking. (*Id.*). Clark reported that his symptoms were alleviated by the use of a bronchodilator, rest, and refraining from smoking. (*Id.*). He denied any other symptoms and described his general health as fair. (*Id.*). Clark continued to smoke approximately half a pack of cigarettes daily and reported moderate alcohol use. (*Id.*).

Upon examination, Clark appeared older than his age, chronically ill, weak and fatigued. (*Id.*). According to Canario, Clark appeared to be in mild to moderate respiratory distress with labored respiration. (*Id.*). Canario noted mild interostal retraction, increased AP diameter, chest expansion bilaterally, moderately decreased airflow, diminished breath sounds, dry inspiratory rales, coarse inspiratory rhonchi and mild expiratory wheezes. (*Id.*). Canario assessed a COPD exacerbation and prescribed Azithromycin and Daliresp and advised Clark to follow-up with his pulmonologist. (*Id.*).

Clark attended another appointment with Canario on July 11, 2012. (Tr. 331-33). During the appointment, Clark reported an asthma attack that had occurred three days earlier. (*Id.*). According to Clark, he had awakened during the night with acute shortness of breath and was able to control his breathing only after using his nebulizer twice. (*Id.*). Clark reported that since that time he had been using his nebulizer and other inhalers daily. (*Id.*). According to Clark, the heat and humidity was aggravating his breathing, and he was better when he was inside with air conditioning. (*Id.*). Clark also complained of right knee pain. (*Id.*).

According to Canario, Clark's lab work demonstrated that he was generally within normal limits except for an elevated lipid profile. (*Id.*). Clark continued to smoke approximately half a pack of cigarettes a day, and his alcohol consumption was moderate. (*Id.*).

Upon examination, Canario noted that Clark appeared mildly ill and well-developed. (*Id.*).

Clark's respirations were regular, shallow and labored, and he had mild intercostal retraction,

moderate mid expiratory wheezing, expiratory rhonchi with no rales and mildly decreased

airflow. (*Id.*). Canario assessed an asthma exacerbation, prescribed Prednisone and advised

Clark to continue taking his asthma medications and to follow-up with his pulmonologist. (*Id.*).

Canario noted that Clark's knee was mildly swollen with limited range of motion.

(*Id.*). Canario ordered an x-ray and instructed Clark to continue taking anti-inflammatories, and

rest, ice and elevate his leg. (*Id.*).

### 5.    Michael C. Kallay, MD – Pulmonary Disease

On September 21, 2011, Clark attended an appointment with Michael C. Kallay

("Kallay"), MD, a pulmonologist. (Tr. 311-21). Clark reported that he had previously been

evaluated by a pulmonologist, but was unable to report the results of the evaluation. (*Id.*). He

reported that he treated his COPD with Advair, a nebulizer and Proair as needed. (*Id.*). He

indicated that he continued to smoke approximately five cigarettes a day and had been smoking

regularly for twenty years. (*Id.*). According to Clark, he had recently been prescribed

Wellbutrin. (*Id.*).

Upon examination, Kallay noted markedly diminished breath sounds that were

hyperresonant to percussion. (*Id.*). A spirometry test demonstrated a severe airway obstruction

with an FEV1 at 57% of predicted and an FVC at 89% of predicted. (*Id.*). Kallay assessed that

Clark suffered from severe obstructive lung disease and emphasized the need for Clark to stop

smoking as soon as possible. (*Id.*). According to Kallay, Clark appeared to have chronic asthma

and was relatively young to develop COPD, although both features could be present with an

alph-1 antitrypsin deficiency; he indicated that he could not determine whether the disease would be reversible.  (*Id.*).

Kallay counseled Clark at length about smoking cessation and ordered blood work to determine whether Clark suffered from alpha-1 antitrypsin deficiency.  (*Id.*).  Kallay also requested a RAST study to determine whether Clark's symptoms were aggravated by common allergens.  (*Id.*).  Kallay also ordered a chest radiograph and PFT's.  (*Id.*).

The chest radiograph demonstrated clear lungs and that the cardiomediastinal silhouette was unremarkable.  (*Id.*).  The results of the RAST demonstrated that Clark was sensitive to cat and house dust.  (*Id.*).  The pulmonary function test, performed on October 21, 2011, demonstrated moderately reduced FEV1 (at 63% of predicted) and a reduced FEV1/FVC ratio of 51% with a 26% improvement in FEVI after a bronchodilator was administered.  (*Id.*).  Kallay noted that the lung volumes demonstrated some air trapping and a mildly reduced diffusion capacity, which was consistent with partially reversible severe airway obstruction.  (*Id.*).

Clark returned for an appointment with Kallay on November 16, 2011.  (Tr. 322-24).  Kallay noted that the results of the Pulmonary Function Test demonstrated a severe airway obstruction that substantially improved post-bronchodilator.  (*Id.*).  A respiratory examination demonstrated diffuse wheezes bilaterally.  (*Id.*).  According to Kallay, Clark was not doing well on Advair alone, and he prescribed Budesonide and Brovana by nebulization to determine whether they would improve Clark's symptoms.  (*Id.*).  Kallay advised that it was "absolutely incumbent upon [Clark] to stop smoking."  (*Id.*).  According to Kallay, other treatment options were available, but the insurance company was unlikely to cover the treatments if Clark continued to smoke.  (*Id.*).  Kallay advised Clark to follow-up in three months.  (*Id.*).

B.    **Medical Opinion Evidence**

1.    **Harbinder Toor, MD**

On June 10, 2011, state examiner Harbinder Toor ("Toor"), MD, conducted a consultative internal medicine examination of Clark.  (Tr. 289-92).  Clark reported that he had been diagnosed with asthma and emphysema/COPD.  (*Id.*).  According to Clark, he had been hospitalized in 2008 for an asthma attack and COPD and his asthma was aggravated by weather changes, dust and perfumes.  (*Id.*).  Clark reported that he had difficulty with physical exertion, prolonged walking or heavy lifting because his COPD caused shortness of breath.  (*Id.*).  Clark also reported that he suffered from high cholesterol.  (*Id.*).

According to Clark, he had smoked cigarettes since he was young and continued to smoke a pack a day.  (*Id.*).  Clark reported that he did not cook, clean, do laundry, shop or care for children.  (*Id.*).  He reported that he was able to care for his own personal hygiene and that he watches television daily.  (*Id.*).

Upon examination, Toor noted that Clark was not in acute distress and had a normal gait, could perform the heel and toe walk and could fully squat.  (*Id.*).  He used no assistive devices and had no difficulty getting on and off the exam table, rising from the chair and changing for the exam.  (*Id.*).

Toor noted that Clark had a normal AP diameter and was wheezing on auscultation.  (*Id.*).  According to Toor, Clark's percussion was normal and he did not have any significant chest wall abnormality and had normal diaphragmatic motion.  (*Id.*).  The remainder of Toor's examination revealed essentially normal findings.  (*Id.*).  Toor diagnosed Clark with a history of COPD, asthma and high cholesterol.  (*Id.*).  He opined that due to his COPD and asthma, Clark had moderate limitations with heavy exertion, lifting and physical activity,

including prolonged walking, standing or running.  (*Id.*).  According to Toor, no other medical limitations were suggested by his evaluation.  (*Id.*).

     **2.**    <u>**Canario**</u>

On September 1, 2011, Canario completed a physical Residual Functional Capacity ("RFC") questionnaire.  (Tr. 293-97).  Canario opined that Clark suffered from COPD and that his prognosis was fair.  (*Id.*).  According to Canario, Clark experienced dyspnea on exertion, shortness of breath, dizziness and coughing.  (*Id.*).  Canario reported that spirometry results indicated a moderately severe obstruction and that Clark demonstrated dyspnea on exertion and a chronic productive cough.  (*Id.*).  Canario noted that Clark was treated with a nebulizer and inhalers, but continued to experience exacerbations.  (*Id.*).  Canario also noted that Clark suffered from depression.  (*Id.*).

According to Canario, Clark was capable of performing low stress jobs, as long as they did not involve "heavy duty work" or "strenuous work" due to Clark's respiratory issues, although his symptoms were likely to interfere frequently with the attention and concentration needed to perform simple work tasks.  (*Id.*).  Canario opined that Clark could walk approximately one-quarter block before needing to rest and could sit for more than two hours at a time and stand for approximately one hour at a time.  (*Id.*).  According to Canario, Clark could stand or walk for less than a total of two hours and could sit for at least a total of six hours during an eight-hour workday.  (*Id.*).  He further opined that Clark did not need a sit/stand at will option and would not need to take unscheduled breaks during the workday.  (*Id.*).

Canario also opined that Clark could occasionally lift less than ten pounds, could rarely lift ten pounds and could never lift twenty pounds or more.  (*Id.*).  According to Canario, Clark would experience good days and bad days and would likely be absent from work more

than four days a month.  (*Id.*).  Additionally, Canario opined that Clark's respiratory issues were exacerbated upon exposure to severe heat and moderate cold conditions.  (*Id.*).

On February 2, 2012, the day that Canario assessed that Clark was suffering from a COPD exacerbation, Canario wrote a letter in which he opined that Clark was unable to perform any type of meaningful work at that time.  (Tr. 328).  According to Canario, Clark was being evaluated by a specialist and should be excused from work indefinitely until a better treatment could be found.  (*Id.*).

On July 11, 2012, the day that Canario assessed that Clark was suffering from an asthma exacerbation, Canario wrote another letter in which he opined that Clark was unable to perform any type of meaningful work, was being evaluated by a specialist and should be excused from work indefinitely until a better treatment was available.  (Tr. 336).

III.    **Non-Medical Evidence**

In his application for benefits, Clark reported that he was born in 1976 and had obtained a GED.  (Tr. 170, 174).  He had previously been employed as a binder, a factory laborer, a mover and a warehouse supervisor.  (Tr. 175).  According to Clark, he stopped working in January 2009 because he was laid off.  (Tr. 174).

Clark reported that he lived in an apartment with his family and cared for his dogs with assistance from his fiancée.  (Tr. 183-84).  According to Clark, he could care for his own personal hygiene, but was unable to take hot showers due to breathing problems.  (Tr. 184-85).  He reported that he made basic meals, but his mother and fiancée prepared more complex meals because his breathing issues made him too tired to do so.  (*Id.*).  Clark reported that he did not perform any household chores or yard work because of his respiratory problems.  (*Id.*).

Clark indicated that he left his apartment daily and was able to go out by himself. (Tr. 186).  According to Clark, he did not have a driver's license and did not shop, although he was able to manage his money and pay bills.  (Tr. 187).  Clark spent his day watching television, taking care of his pets and playing on his computer.  (Tr. 184, 187).  Clark socialized once every few months and left his apartment to attend scheduled doctor's appointments.  (Tr. 188).

According to Clark, his illness limited his ability to lift, stand, walk, climb stairs, kneel, squat and reach.  (Tr. 188-89).  He stated that he could stand for approximately one-half hour and could walk approximately one block before needing to rest for at least an hour. (Tr. 188-90).  Clark reported that he did not have any difficulty paying attention, following spoken or written instructions or getting along with others.  (Tr. 190).  He was able to handle stress, but sometimes had trouble remembering things.  (Tr. 191).  According to Clark, he did not sleep well due to his troubled breathing.  (Tr. 184).

During the administrative hearing, Clark testified that he lived in an apartment with his mother.  (Tr. 47).  According to Clark, the apartment had multiple sets of stairs, which he had difficulty navigating due to his troubled breathing and a knee impairment.  (Tr. 47-48). He had completed the tenth grade, but had not obtained his GED.  (Tr. 48).

Clark testified that he had last been employed several years earlier as a dock supervisor and forklift operator.  (*Id.*).  In that role, Clark performed the responsibilities of a dock worker and also instructed other workers.  (Tr. 49).  According to Clark, he worked in that position for approximately four years before being laid off.  (Tr. 49, 54).  Clark also reported that he had previously been employed as a bindery, which required him to feed pages into a machine (Tr. 51), and as a mover, which required him to move large pieces of furniture and drive trucks

(Tr. 53).  Clark testified that he was also employed installing fencing, but had to quit that job after experiencing an asthma attack.  (Tr. 62).

Clark testified that he believed he would be unable to return to work due to his breathing problems.  (Tr. 54).  Clark believed that he would not be able to perform a sedentary job in an office setting because he did not have adequate experience and could not be around people wearing perfume.  (Tr. 63).

According to Clark, his breathing limits his ability to garden and requires him to take breaks when he mows his lawn.  (*Id.*).  Clark testified that his breathing symptoms are worse in extreme temperatures.  (*Id.*).  He is able to walk each of his two dogs for about five minutes before needing to rest, but his breathing does not limit his ability to stand in one place.  (Tr. 55, 61-62).

Clark testified that he suffers from COPD and sometimes suffers asthma attacks, which he must treat with his nebulizer.  (Tr. 57-58).  He uses the nebulizer four times a day, which provides a few hours of relief each time.  (*Id.*).  According to Clark, since he was prescribed a nebulizer, he has rarely had to visit the emergency room.  (Tr. 57-59).  Clark testified that his asthma attacks are triggered by heat, cat hair, perfume, dirt, dust and diesel fumes.  (Tr. 59).

Clark testified that he spends his summer days inside his house with air conditioning and is not able to assist with household chores because dust and cleaning chemicals exacerbate his breathing condition.  (Tr. 60).  According to Clark, he is unable to lift heavy objects, such as a gallon of milk, without experiencing shortness of breath.  (Tr. 60-61).  Clark testified that he is able to walk approximately one block to the grocery store, but is unable to carry groceries home.  (*Id.*).

Clark testified that he continues to smoke cigarettes, but has decreased his consumption to one or two, but no than five, cigarettes per day.  (Tr. 64-65).  According to Clark, Wellbutrin had assisted in decreasing his level of smoking.  (*Id.*).  Clark testified that although he wanted to stop smoking, he did not think that he would be successful because of his attitude and addiction.  (Tr. 68).

Vocational expert, Dennis Conroy ("Conroy"), also testified during the hearing. (Tr. 68-82).  The ALJ asked Conroy to characterize Clark's previous employment.  (Tr. 74). According to Conroy, Clark had been employed as a warehouse working supervisor, forklift operator, furniture mover, material handler and a binder.  (*Id.*).

The ALJ then asked Conroy whether a person would be able to perform any of the work that Clark previously had performed who was the same age as Clark, with the same education and vocational profile, who could perform work at the sedentary exertional level, except that he would require an option of alternating between sitting and standing in one-hour increments, could only occasionally and non-repetitively climb ramps or stairs, and could not climb ladders, ropes or scaffolds, and who must avoid exposure to extreme heat, excessive humidity and environmental irritants.  (Tr. 76).  Conroy testified that such an individual would be unable to perform the previously-identified positions, but would be able to perform other positions in the national economy, including account clerk, order clerk and telephone quotation clerk.  (Tr. 76-77).

The ALJ then asked Conroy whether jobs would exist for the same individual with the same limitations, except that the individual would need to perform the job "nearly exclusively" in the seated position, have a sit/stand option, and be limited to little, if any, walking and, in no event, more than five minutes at a time.  (Tr. 78).  Conroy testified that such

an individual could perform the jobs he previously listed.  (*Id.*).  The ALJ then asked Conroy to

opine on the number of employment-related absences that would be permitted for unskilled

employment.  (*Id.*).  Conroy responded that more than one absence a month likely would be

impermissible.  (Tr. 79).

Clark's attorney then asked Conroy how frequently an individual in the identified

jobs would interact with coworkers, supervisors and the general public.  (Tr. 80).  Conroy

testified that any competitive employment generally requires workers to be around other people.

(*Id.*).  Clark's attorney asked Conroy whether there would be additional environmental irritants,

other than those included within the definition of environmental irritants set forth in the

Dictionary of Occupational Titles ("DOT"), found in the environment of the identified jobs.

(*Id.*).  Conroy testified that the jobs identified were not identified as "sterile environments" and

could be expected to contain some level of other irritants, such as perfumes or cleaning

chemicals.  (Tr. 81).

## DISCUSSION

### I.   Standard of Review

This Court's scope of review is limited to whether the Commissioner's

determination is supported by substantial evidence in the record and whether the Commissioner

applied the correct legal standards.  *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004)

("[i]n reviewing a final decision of the Commissioner, a district court must determine whether

the correct legal standards were applied and whether substantial evidence supports the

decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also*

*Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo*

whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's

conclusions are supported by substantial evidence in the record as a whole or are based on an

erroneous legal standard") (internal citation and quotation omitted).  Pursuant to 42 U.S.C.

§ 405(g), a district court reviewing the Commissioner's determination to deny disability benefits

is directed to accept the Commissioner's findings of fact unless they are not supported by

"substantial evidence."  *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to

any fact, if supported by substantial evidence, shall be conclusive").  Substantial evidence is

defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401

(1971) (internal quotation omitted).

>   To determine whether substantial evidence exists in the record, the court must

consider the record as a whole, examining the evidence submitted by both sides, "because an

analysis of the substantiality of the evidence must also include that which detracts from its

weight." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  To the extent

they are supported by substantial evidence, the Commissioner's findings of fact must be

sustained "even where substantial evidence may support the claimant's position and despite the

fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise." *Matejka v.*

*Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d

60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

>   A person is disabled for the purposes of SSI and disability benefits if he or she is

unable "to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months."  42 U.S.C.

§§ 423(d)(1)(A) & 1382c(a)(3)(A).  When assessing whether a claimant is disabled, the ALJ

must employ a five-step sequential analysis.  *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir.

1982) (*per curiam*).  The five steps are:

> (1)  whether the claimant is currently engaged in substantial gainful activity;
>
> (2)  if not, whether the claimant has any "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities";
>
> (3)  if so, whether any of the claimant's severe impairments meets or equals one of the impairments listed in Appendix 1 of Subpart P of Part 404 of the relevant regulations;
>
> (4)  if not, whether despite the claimant's severe impairments, the claimant retains the residual functional capacity to perform his past work; and
>
> (5)  if not, whether the claimant retains the residual functional capacity to perform any other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467.

"The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t

step five the burden shifts to the Commissioner to 'show there is other gainful work in the

national economy [which] the claimant could perform.'"  *Butts v. Barnhart*, 388 F.3d at 383

(quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

    **A.**    **The ALJ's Decision**

        In his decision, the ALJ followed the required five-step analysis for evaluating

disability claims.  (Tr. 11-19).  Under step one of the process, the ALJ found that Clark has not

engaged in substantial gainful activity since January 17, 2009, the alleged onset date.  (Tr. 13).

At step two, the ALJ concluded that Clark has the severe impairments of asthma, COPD and

right knee patella femoral syndrome.  (*Id.*).  At step three, the ALJ determined that Clark does

not have an impairment (or combination of impairments) that meets or medically equals one of the listed impairments. (Tr. 14). The ALJ concluded that Clark has the RFC to perform sedentary work, except that he requires a job that may be performed nearly exclusively in the seated position with very little, if any, walking, and in no event more than five minutes at a time, requires an option of alternating between sitting and standing, is restricted to only occasional and non-repetitive climbing of ramps or stairs, and is precluded from climbing ladders, ropes or scaffolds and exposure to extreme heat, excessive humidity and environmental irritants. (Tr. 14-17). At steps four and five, the ALJ determined that Clark was unable to perform his prior work, but that other jobs existed in the national and regional economy that he could perform, including the positions of account clerk, order clerk and telephone quotation clerk. (Tr. 17-18). Accordingly, the ALJ found that Clark is not disabled. (*Id.*).

      **B.**    **<u>Clark's Contentions</u>**

      Clark contends that the ALJ's determination that he is not disabled is not supported by substantial evidence and is the product of legal error. (Docket # 10-1). First, he challenges the ALJ's RFC assessment on the grounds that the ALJ failed to give appropriate weight to the opinions of Clark's treating physician and that his RFC analysis is not otherwise supported by substantial evidence. (Docket ## 10-1 at 13-23; 12 at 1-9). Next, Clark maintains that ALJ failed to properly assess his credibility. (Docket ## 10-1 at 23-28; 12 at 7-9). Finally, he contends that the ALJ's step five determination was erroneous because the vocational expert's testimony should have compelled a finding of disability and, in any event, the determination is not based upon substantial evidence because the hypothetical posed to the vocational expert was based upon a flawed RFC analysis. (Docket ## 10-1 at 21-23, 29-30; 12 at 9-10).

## II.  Analysis

### A.  RFC Assessment

I turn first to Clark's contention that the ALJ's RFC assessment was flawed.  An individual's RFC is his "maximum remaining ability to do sustained work activities in an ordinary work setting on a continuing basis."  *Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir.1999) (quoting SSR 96–8p, 1996 WL 374184, *2 (1996)).  In making an RFC assessment, the ALJ should consider "a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis."  *Pardee v. Astrue*, 631 F. Supp. 2d 200, 221 (N.D.N.Y. 2009) (citing 20 C.F.R. § 404.1545(a)).  "To determine RFC, the ALJ must consider all the relevant evidence, including medical opinions and facts, physical and mental abilities, non-severe impairments, and [p]laintiff's subjective evidence of symptoms."  *Stanton v. Astrue*, 2009 WL 1940539, *9 (N.D.N.Y. 2009) (citing 20 C.F.R. §§ 404.1545(b)-(e)), *aff'd*, 380 F. App'x 231 (2d Cir. 2010).

### 1.  Weight Accorded to Canario's Opinions

Clark argues that the ALJ improperly discounted the three opinions provided by Canario on September 11, 2011, February 2, 2012 and July 11, 2012.  (Docket # 10-1 at 13-18).  As an initial matter, the opinions provided by Canario on February 2, 2012 and July 11, 2012 were wholly conclusory, did not identify any specific limitations arising from Clark's breathing issues and reached a conclusion that is expressly reserved for the Commissioner.  As such, and as noted by the ALJ, he was not obligated to accord significant weight to Canario's conclusory opinions that Clark's medical impairments prevented him from working.  *See Osbelt v. Colvin*, 2015 WL 344541, *3 (W.D.N.Y. 2015) (physician's letter "which concluded that '[claimant] is unable to work in any significant capacity given ongoing emotional and physical limitations'

. . . [did] not specify the nature of such limitations, or describe how they would render plaintiff incapable of work" amounted to a "conclusory opinion concerning the ultimate issue of disability, [a] matter [that] is unquestionably reserved for the Commissioner") (internal quotation omitted); *Wilferth v. Colvin*, 2014 WL 4924117, *3 (W.D.N.Y. 2014) ("[the doctor's] opinion . . . does not specify any particular limitation on plaintiff's capacity: it is no more than a conclusory opinion on the ultimate issue of disability, which is unquestionably a matter reserved to the Commissioner") (internal quotation omitted); *Thompson v. Colvin*, 2014 WL 7140575, *9 (D. Vt. 2014) (doctor's opinion that claimant was currently unable to work was not entitled to weight; "the opinion[] [is] conclusory and do[es] not list any practical functional consequences of [claimant's] mental impairments, stating merely that 'complications with anxiety, PTSD[,] and agoraphobia' have caused her to be unable to work"); *Emery v. Astrue*, 2012 WL 4892635, *6 (D. Vt. 2012) ("the ALJ was not obligated to afford significant weight to [the doctor's] conclusory opinion that [claimant's] impairments limited 'her ability to hold a full-time job'").

Further, I disagree with Clark's contention that the ALJ failed to provide good reasons for discounting Canario's RFC assessment dated September 1, 2011. "An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). The ALJ must explicitly consider:

(1)   the frequency of examination and length, nature, and extent of the treatment relationship,

(2)   the evidence in support of the physician's opinion,

(3)   the consistency of the opinion with the record as a whole,

(4)   whether the opinion is from a specialist, and

> (5)     whatever other factors tend to support or contradict the
>          opinion.

*Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x 197, 199 (2d Cir. 2010).  The regulations also

direct that the ALJ should "give good reasons in [his] notice of determination or decision for the

weight [he] give[s] [claimant's] treating source's opinion." *Halloran v. Barnhart*, 362 F.3d at 32

(quoting 20 C.F.R. § 404.1527(c)(2)).  "Even if the above-listed factors have not established that

the treating physician's opinion should be given controlling weight, it is still entitled to

deference, and should not be disregarded." *Salisbury v. Astrue*, 2008 WL 5110992, *4

(W.D.N.Y. 2008).  The same factors should be used to determine the weight to give to a

consultative physician's opinion.  *Tomasello v. Astrue*, 2011 WL 2516505, *3 (W.D.N.Y. 2011).

"However, if the treating physician's relationship to the claimant is more favorable in terms of

the length, nature and extent of the relationship, then the treating physician's opinion will be

given more weight than that of the consultative examining physician." *See id.*

As an initial matter, I note that although the ALJ gave "limited weight" to

Canario's opinion, he in fact adopted many of the limitations assessed by Canario.  For instance,

the ALJ limited Clark to sedentary work – consistent with Canario's opinion that Clark could not

perform "heavy duty" or "strenuous work," and required that Clark have the option to sit and

stand at will in one-hour increments – consistent with Canario's opinion that Clark could only

stand for one hour at a time.  (Tr. 14, 294).  Further, the ALJ limited Clark to sedentary jobs that

could be performed almost exclusively in the seated position, with no more than five minutes of

walking at a time – consistent with Canario's opinion that Clark could stand or walk less than

two hours in a workday and could sit for more than six hours in a workday.  (Tr. 14, 295).

Clark maintains that, despite these limitations, the ALJ improperly rejected

Canario's opinions that Clark would frequently experience pain or other symptoms that would

interfere with his attention and concentration and would likely be absent from work more than four days a month due to his illness.  (Docket # 12 at 4-5).  I conclude that the ALJ provided "good reasons" for his decision to assign limited weight to Canario's opinion.  In his decision, the ALJ recognized that Canario was Clark's treating physician, but accorded his opinions little weight because he found that they were not supported by the record.  (Tr. 16-17).

Specifically, the ALJ noted that the treatment records demonstrated mild to moderate findings and that Clark's condition had improved with treatment and a medication regimen, including improved FEV1 and FVC values over time.  (Tr. 15).  Further, the ALJ properly concluded that some of the limitations assessed by Canario were directly refuted by Clark's own testimony concerning his physical capabilities.  Accordingly, I conclude that the ALJ did not violate the treating physician rule by according "limited weight" to Canario's opinions for the reasons he explained.  *See Harrington v. Colvin*, 2015 WL 790756, *16 (W.D.N.Y. 2015) (ALJ properly discounted treating physician opinion where it assessed limitations that were inconsistent with findings contained in the treatment records and with admissions claimant had made concerning his activities of daily living); *Wilferth v. Colvin*, 2014 WL 4924117 at *3 (ALJ properly weighed treating physician opinion and "adequately explained her reasons for declining to grant controlling weight to his conclusion" where opinion was "inconsistent with other opinions in the record, as well as statements made by the plaintiff himself, and none of the objective test records . . . indicate a level of disability greater than that reflected in the plaintiff's RFC, as determined by the ALJ"); *Gladle v. Astrue*, 2008 WL 4411655, *5 (N.D.N.Y. 2008) (ALJ properly discounted opinion of treating physician where it was inconsistent with treatment records and objective findings of the consultative examiner).

In any event, I conclude that the ALJ's RFC assessment was supported by substantial evidence. The record reflects that Clark was first diagnosed with COPD in 2008, while he was employed in a position that he performed at a heavy exertional level. (Tr. 74). Clark did not seek treatment for his breathing until March 2011, approximately one month before he applied for benefits. At that time, diagnostic testing demonstrated that Clark continued to suffer from moderately obstructed airways,[3] but his spirometry results had improved since 2008 and he demonstrated significant improvement after treatment was administered. The treatment records suggest that Clark's condition continued to improve with treatment, although he did suffer two exacerbations in February and July 2012. All of the examinations of record demonstrate that Clark suffers from COPD-related symptoms, primarily shortness of breath. The ALJ's RFC accounted for Clark's physical impairments by limiting him to a sedentary job performed almost exclusively in the seated position and by limiting him to walking no more than five minutes at a time, consistent with Clark's testimony regarding his walking limitations.

Canario's conclusion that Clark would suffer from impaired attention and concentration is not supported by any evidence in the record and is directly refuted by Clark's admission that he did not suffer from attention or concentration problems. (Tr. 190). Similarly, nothing in the record supports Canario's conclusion that Clark would be absent from work more than four days a month. According to the treatment records, Clark's pulmonary functioning was at its worst in 2008 when he was employed in a heavy-exertion job. Clark testified that that job ended, not because he could no longer perform its requirements, but because he was laid off.[4] Clark testified that his nebulizer was effective in alleviating his asthma attacks and had

---

[3] Subsequent testing by Kallay demonstrated a severe airway obstruction in September 2011, but by October 2011 a pulmonary function test demonstrated only moderately reduced FEV1 values (to 63% of predicted), which further improved after a bronchodilator was administered. (Tr. 311-12).

[4] Clark later testified that he did not believe he would have been able to continue his job because it involved exposure to zinc fumes. (Tr. 64).

substantially reduced his need for emergency department visits.  (Tr. 58-59).  On this record, I

conclude that the ALJ's RFC assessment was reasonable and supported by substantial evidence.

*Pellam v. Astrue*, 508 F. App'x 87, 90 (2d Cir. 2013).

### 2.      Clark's Remaining RFC Challenges

Clark also challenges the ALJ's RFC assessment on the grounds that he

improperly relied on the vague opinions provided by Toor, the one-time examining physician,

included an inconsistent finding that Clark was capable of "light work" in his analysis, and

formulated an RFC without explaining how it was supported by the medical evidence.  (Docket

## 10-1 at 18-21; 12 at 3-6).

Clark contends that Toor's opinion is not entitled to "considerable weight"

because he was a one-time examining physician and because his opinion assessed "moderate"

limitations, which Clark maintains is an impermissibly vague term.  (Docket ## 10-1 at 18-20;

12 at 5-7).  These arguments have been rejected by this Court, and the record in this case

compels the same conclusion.  *See Fuentes v. Colvin*, 2015 WL 631969, *8 (W.D.N.Y. 2015) ("I

disagree that [the consulting examiner] is not entitled to 'great weight' because she only

examined [claimant] on one occasion[;] [t]he opinion of a consultative examiner can constitute

substantial evidence supporting an ALJ's decision") (internal quotations omitted); *Ross v.

Colvin*, 2015 WL 1189559, *12 (W.D.N.Y. 2015) ("[a]lthough . . . an expert opinion may

describe a claimant's impairments in terms that are so vague as to render the opinion useless, the

use of phrases such as 'moderate' or 'mild' by a consultative examiner does not automatically

render an opinion impermissibly vague") (citing *Rosenbauer v. Astrue*, 2014 WL 4187210, *16

(W.D.N.Y. 2014)).

Clark is correct that the ALJ's decision purportedly contains an inconsistency by limiting Clark "to the light exertional category with additional restrictions on his posture and work environment." (Tr. 16). I easily conclude that the ALJ inadvertently used the term "light" rather than "sedentary" in this sentence. The ALJ's RFC determination clearly limited Clark to sedentary work (Tr. 14), the hypotheticals posed by the ALJ to the vocational expert were limited to sedentary work (Tr. 75-79), and the positions identified by the ALJ at step five were all sedentary positions (Tr. 18, 75-79). Thus, "the record and the language of the ALJ's decision demonstrates that his RFC determination includes the same limitations as he posed to the vocational expert during the hearing." *Wearen v. Colvin*, 2015 WL 1038236, *13 (W.D.N.Y. 2015). According, the one reference to "light" instead of "sedentary" work in the body of the decision "was merely a harmless typographical error and does not necessitate remand." *See id.* (collecting cases).

I disagree with Clark's contention that the ALJ failed to explain how his RFC was supported by the medical evidence. (Docket # 10-1 at 20-21). To the contrary, the ALJ recounted the medical treatment records at length and fully discussed the opinions provided by Toor and Canario. As discussed above, the ALJ ultimately determined that some of the limitations assessed by Canario were inconsistent with the record and with Clark's testimony and thus rejected those limitations. The ALJ nevertheless formulated Clark's RFC to reflect the limitations identified by Toor and those identified by Canario that were otherwise supported by the record. Additionally, although the ALJ did not find Clark fully credible, he nevertheless afforded him the benefit of the doubt and accepted his claim that he could not walk for longer than five minutes at a time. (Tr. 16). I conclude that the ALJ's RFC assessment "took account of the opinions of all of [the] experts and the notes of [the] treatment providers." *Matta v.*

*Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013).  "Although the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole."  *See id.*

  **B.**  **Credibility Assessment**

    I turn next to Clark's contention that the ALJ's credibility analysis is flawed because he applied the incorrect legal standards, discounted Clark's credibility because of his continued smoking and failed to support his credibility determination with a complete discussion of the record.  (Docket # 10-1 at 23-28).

    An ALJ's credibility assessment should reflect a two-step analysis.  *Robins v. Astrue*, 2011 WL 2446371, *4 (E.D.N.Y. 2011).  First, the ALJ must determine whether the evidence reflects that the claimant has a medically determinable impairment or impairments that could produce the relevant symptom.  *Id.* (citing 20 C.F.R. § 404.1529).  Next, the ALJ must evaluate "the intensity, persistence and limiting effects of the symptom, which requires a credibility assessment based on the entire case record."  *Id.* (citing 20 C.F.R. § 404.1529(c)).  The relevant factors for the ALJ to weigh include:

> (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the claimant's pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate [his] pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of her pain or other symptoms; (6) any measures the claimant uses or has used to relieve her pain or other symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.

*Id.* (citing 20 C.F.R. § 404.1529(c)(3)(i)-(vii)).

The ALJ concluded that Clark's statements "concerning the intensity, persistence and limiting effects of [his] symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. 15).  In doing so, the ALJ assessed Clark's subjective complaints in the context of a comprehensive review of the entire record.  I disagree with Clark's contention that the ALJ relied only on part of the record in conducting his credibility assessment.

The ALJ recounted Clark's treatment records demonstrating his history of asthma and his diagnosis with COPD in 2008.  (*Id.*).  The ALJ noted that Clark did not receive ongoing treatment for his impairments between 2008 and 2011.  (*Id.*).  The ALJ noted that Clark's symptoms persisted and that the objective findings from treatment records in 2011 demonstrated "mildly to moderately decreased airflow with some wheezes and rhonchi," but improved spirometry testing values over time.  (*Id.*).  The ALJ also noted that Clark continued to smoke despite repeated warnings and directions from his doctors.  (*Id.*).  According to the ALJ, Clark's most recent treatment records indicate that he continued to smoke half a pack a day and that his pulmonologist had told him that other treatments were available, but they were unlikely to be covered by his insurance because of his continued smoking.  (*Id.*).

After a comprehensive review of the record, the ALJ concluded that Clark's credibility concerning the severity of his impairments was undermined by several facts.  First, the ALJ determined that the record did not corroborate Clark's testimony that he needed to completely avoid interacting with anyone wearing perfume.  (Tr. 16).  Next, the ALJ concluded that Clark's testimony that he had been smoking fewer than five cigarettes a day since he first started taking Wellbutrin was belied by the record "indicating that [Wellbutrin] ha[d] been prescribed during the entire[t]y of his claim and by the claimant's regular admissions during this

period of smoking a half pack of cigarette or more a day." (*Id.*). Finally, the ALJ noted that

Clark did not stop working due to his impairments, but instead was laid off. (*Id.*). I conclude

that the ALJ applied the proper legal standards in analyzing Clark's subjective complaints and

that substantial evidence supports the ALJ's determination that Clark's complaints were "not

credible" to the extent they were inconsistent with the ALJ's RFC assessment. *See Luther v.*

*Colvin*, 2013 WL 3816540, *7 (W.D.N.Y. 2013) (ALJ properly assessed subjective complaints

where she "reviewed all of [p]laintiff's subjective complaints . . . [and] properly considered

[p]laintiff's activities of daily living, inconsistent testimony and how her symptoms affected her

attempts at maintaining a job").

   I also reject Clark's argument that the ALJ incorrectly found that Clark's

statements were not credible solely because they were inconsistent with the ALJ's RFC finding.

To the contrary, the ALJ's decision demonstrates that he evaluated Clark's credibility after

carefully reviewing the evidence. *Diakogiannis v. Astrue*, 975 F. Supp. 2d 299, 318 (W.D.N.Y.

2013) ("[t]his argument has been rejected by a number of courts[;] . . . [t]he ALJ specifically

stated that she assessed [claimant's] statements concerning the intensity, persistence and limiting

effects of his symptoms after careful consideration of the evidence") (internal quotation omitted)

(collecting cases).

   Clark also challenges the ALJ's credibility assessment on the grounds that the

ALJ improperly relied upon Clark's continued smoking to discount his credibility. (Docket

# 10-1 at 25-29). "An ALJ can properly consider a claimant's failure to quit smoking as

impacting on the credibility of [his] complaints of disability respiratory problems[;] . . .

[h]owever, a claimant's failure to quit smoking will generally be an unreliable basis on which to

rest a credibility determination, due to the addictive nature of smoking." *Farrell v. Comm'r of Soc. Sec.*, 2013 WL 4455697, *2 (N.D.N.Y. 2013) (internal quotation omitted).

Contrary to Clark's contention, although the ALJ recognized that Clark continued to smoke against the advice of his physicians, his credibility determination did not rest on Clark's continued smoking. Rather, in the one paragraph directly addressing Clark's credibility, the ALJ cited specific reasons in the record for discounting Clark's credibility, including his sworn testimony that was inconsistent with information contained in the treatment records. The ALJ did not discount Clark's credibility due to his continued smoking.[5] Thus, the cases cited by Clark, which caution that continued smoking should not result in an automatic adverse credibility determination, are inapposite.[6] (Docket # 10-1 at 25 (citing, e.g., *Riechl v. Barnhart*, 2003 WL 21730126, *13 (W.D.N.Y. 2013)).

I also reject Clark's argument that the ALJ improperly applied the guidance found in Social Security Rule 82-59 ("SSR 82-59"). (Docket ## 10-1 at 28-29; 12 at 8-9). "The SSR 82-59 rule applies when the claimant has already been found to be disabled, but the ALJ concludes that [he] is not entitled to benefits because compliance with the prescribed treatment would restore [his] ability to work." *Goff v. Astrue*, 993 F. Supp. 2d 114, 127 (N.D.N.Y. 2012). SSR 82-59 does not apply in this case because "the ALJ did not find [Clark] disabled in the first instance." *See id.* at 128.

---

[5]   In another portion of his decision, the ALJ noted that other treatments are available but apparently require Clark to quit smoking and cited a Sixth Circuit case stating, "the Social Security Act did not repeal the principle of individual responsibility[,] . . . [and] if [the claimant] is not truly disabled, he has no right to require those who pay social security taxes to help underwrite the cost of his ride." (Tr. 15-16 (citing *Sias v. Sec'y of Health and Human Servs.*, 861 F.2d 475 (6th Cir. 1988))). Whether or not *Sias* accurately reflects Second Circuit principles, nothing in the record demonstrates that the ALJ denied disability on the grounds that Clark continued to smoke and thus aggravated his impairments.

[6]   Social Security Rule 96-7P ("SSR 96-7P") permits an ALJ to conclude that a claimant's statements are less than credible if the claimant does not comply with recommended treatment. *See* SSR 96-7P, 1996 WL 374186 (1996). Pursuant to the rule, the ALJ is not permitted to draw an adverse inference "without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." *Id.* at *7.

In sum, I conclude that the ALJ applied the correct legal standard in assessing Clark's credibility and that his credibility determination is supported by substantial evidence in the record.

C.      **Step Five Determination**

Finally, I turn to Clark's challenge to the ALJ's step five determination.  Clark maintains that the ALJ's step five determination was flawed because the ALJ's RFC assessment conflicted with the vocational expert's testimony.  (Docket # 10-1 at 21-23).  According to Clark, the ALJ concluded in his RFC assessment that Clark should be limited to positions that prevent exposure to environmental irritants.  (*Id.*).  Yet, Clark maintains, the vocational expert testified that the positions he identified would permit exposure to environmental irritants.  (*Id.*).

The vocational expert testified that the positions he identified would prevent Clark's exposure to environmental irritants as defined in the DOT.  (Tr. 80).  The vocational expert also testified that the identified positions would permit exposure to other potential irritants, including perfume, not encompassed within the DOT definition.  (Tr. 80-81).  The vocational expert's testimony makes clear that the term "environmental irritants" does not encompass perfume; thus, there is no conflict between the vocational expert's testimony and the ALJ's RFC assessment that Clark must avoid exposure to environmental irritants.

The decision also makes clear that the ALJ did not find sufficient support in the record for Clark's contention that he must avoid exposure to perfume in the workplace.  (Tr. 16).  First, as discussed above, substantial evidence supports the ALJ's credibility determination.  Moreover, as the ALJ noted, Clark testified that he is able to go shopping, an activity that involves interaction with other individuals.  (*Id.*).  Similarly, Clark stated that he regularly attends appointments in doctors' offices, but did not suggest that his symptoms were exacerbated

by exposure to other people in those settings.  (Tr. 188).  Finally, as noted by the ALJ, Clark's

treatment notes contain minimal references to his alleged sensitivity to perfume.  (Tr. 16).

Tellingly, although Clark told Shetty and Toor, each of whom evaluated Clark on a single

occasion, that he was sensitive to perfumes (Tr. 283, 289), the treatment notes of his treating

physician, Canario, and his treating pulmonologist, Kallay, do not mention this alleged

sensitivity.  Indeed, although Canario opined that Clark should avoid exposure to extreme

temperatures, he did not opine that Clark should avoid exposure to any irritants, such as perfume.

(Tr. 297).  In fact, Clark's pulmonologist administered objective tests to identify potential

triggers for Clark's symptoms.  The results demonstrated that Clark was sensitive to animal hair

and house dust, but did not mention perfume.  (Tr. 315).

        Clark also maintains that the ALJ erred in relying on the testimony of the

vocational expert because the hypothetical posed to the expert was based upon a flawed RFC

assessment.  (Docket # 10-1 at 29-30).  "Having determined that substantial evidence supports

the ALJ's RFC determination, this argument is rejected."  *See Diakogiannis v. Astrue*, 975

F. Supp. 2d at 319 (citing *Wavercak v. Astrue*, 420 F. App'x 91, 95 (2d Cir. 2011)).

Accordingly, I conclude that substantial evidence supports the ALJ's step five determination.


## **CONCLUSION**

        After careful review of the entire record, this Court finds that the Commissioner's

denial of SSI/DIB was based on substantial evidence and was not erroneous as a matter of law.

Accordingly, the ALJ's decision is affirmed.  For the reasons stated above, the Commissioner's

motion for judgment on the pleadings **(Docket # 11)** is **GRANTED**.  Clark's motion for

judgment on the pleadings (**Docket # 10**) is **DENIED**, and Clark's complaint (Docket # 1) is dismissed with prejudice.

**IT IS SO ORDERED.**


_____
*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge


Dated:  Rochester, New York
        March 30, 2015